**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **Criminal No: 1:14-CR-00383** |
| | ) | |
| **v.** | ) | **The Honorable T.S. Ellis, III** |
| | ) | |
| **PATRICK FRIEDEL,** | ) | **Sentencing:  April 24, 2015** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S POSITION WITH REGARD TO**
**18 U.S.C. § 3553(a) SENTENCING FACTORS**
**REDACTED VERSION**[*]

The defendant, Patrick Friedel, through undersigned counsel, respectfully submits to the Court his position regarding the sentencing factors espoused in 18 U.S.C. § 3553(a), and his memorandum in aid of sentencing.  The Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005), and its progeny require district courts to consider all the factors contained in § 3553(a) when calculating a criminal defendant's ultimate sentence.  This motion presents Mr. Friedel's position with regard to those factors contained in § 3553(a). Based on all of the sentencing factors in this case, including most notably: (1) the history and characteristics of Mr. Friedel; (2) the persuasive evidence that non-violent sex offenders such as Mr. Friedel have lower recidivism rates and can be effectively and safely managed in the community while on supervised release; and (3) the fact that Mr. Friedel has accepted responsibility and, by pleading guilty, saved all parties (including most importantly the minors) the trauma of a trial, the defense respectfully requests that the Court impose a sentence no greater

---

[*] The full version of this pleading is filed under seal because it contains information about the defendant's cooperation with the government.  A Motion to Seal with accompanying documents has been filed contemporaneously with the filing of this sentencing memorandum.

than 180 months incarceration, followed by a very substantial term of supervised release.  We respectfully suggest, given that the Court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and to "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in the statute, that such a sentence is far more than sufficient.[1]

## INTRODUCTION

Mr. Friedel comes before the Court for sentencing having entered a plea of guilty to both counts of a two-count Information charging him with Production of Child Pornography, in violation of 18 U.S.C. § 2251(a), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).  He brings with him an immeasurable amount of regret, remorse, sorrow, humiliation and despair for his conduct in this case.  To those who know Mr. Friedel, it is inconceivable that he would stand accused of any offense, much less one involving crimes such as those to which he has admitted guilt.  Indeed, when the Court considers his upbringing, background and actions in this case, it is quite clear that Patrick Friedel is not the typical criminal defendant.

In fact this is not an ordinary criminal case.  It is an extraordinary one in which justice can be achieved only with a full understanding of the unusual and tragic circumstances that surrounded the defendant's past and the crime itself.  Mr. Friedel, an admitted and diagnosed young man with a Specified Paraphilic Sexual Disorder akin to an addiction, engaged in random sexual contact with hundreds upon hundreds of adult women.  During the course of his searching the internet and social sites he encountered and chatted with five women under the age of 18 and

---

[1] As of the writing of this memorandum the Government has yet to file any pleadings that would allow the Court to depart below the Sentencing Guidelines' range or the mandatory minimum required by statute; but the defense holds out hope that such a motion will be filed and if it is we will be requesting that the court impose a sentence far less than the mandatory minimum of 180 months' incarceration.

engaged in sexual contact with one.  To put it mildly that was a crime.  No one disputes that this case involves reprehensible conduct.  The question here is not whether Mr. Friedel will serve a very lengthy term in prison followed by an exceedingly restrictive and prolonged term of supervised release - - under any possible sentence the Court can impose, he will.  Instead, the issue is whether Mr. Friedel's life should be thrown away by imposing a draconian Guidelines' sentence that in effect will do just that.  Yes, his conduct was criminal.  He accepted responsibility for his conduct by entering an early plea and he feels immeasurable remorse.[2]  But unlike the typical criminal case, the roles of "perpetrator" and "victim" are not easily distinguished here, and Mr. Friedel's state of mind at the time of his offense was far from malicious.

As discussed in detail in the pages that follow, Mr. Friedel committed his crime during a period of his life when his long-term battle with his high sex drive left him emotionally and physically drained and unable to make rational decisions.  Thus when a handful of under age females answered his ads for casual sex (or, more often, just conversation about sex) he simply did not have the ability to say no once he learned they were not 18 years of age.[3]  Mr. Friedel's conduct was wrong, but he is not a heartless criminal whose crime was committed out of a premeditated desire to seek out minors, nor is he even a remote threat to the community that he has served faithfully for so many years.  The letters of support that have been submitted to the Court attest to that conclusion.  *See* Exhibit B.[4]

---

[2] *See* Mr. Friedel's letter to the Court attached as Exhibit A.
[3] One of the two dating sites used by Mr. Friedel required participants to list an age of 18 or older.
[4] Telephone numbers and home addresses have been redacted from the letters filed electronically. Complete copies will be provided the government (and the Court if it wishes) should government counsel wish to contact Mr. Friedel's references.

We respectfully submit that his conduct in this case is inconsistent and inapposite to the type of person that he truly is. Nevertheless, his actions in this case were wrong and unjustifiable. In pleading guilty, he has taken full responsibility for his actions and has tried his best to atone for his actions by cooperating fully with the Government in its investigation of his crime and in attempting to cooperate with the Government in other investigations.

The question before the Court in the post-*Booker* era is how justice will be served in this exceptional case. The Court must of course consider the Sentencing Guidelines, but it also must take into account all of the circumstances of the offense and all of the characteristics of Mr. Friedel. The defense submits that the path to justice in this case is far less than clear. If the Government does not file a motion allowing the Court to depart from the statutory mandatory minimum of 15 years, then we ask the Court to sentence him to no more than 180 months of incarceration—a sentence that for this man and this crime will still be far more than necessary to meet the goals of federal sentencing. But we implore the Court to not incarcerate Mr. Friedel any longer for this crime. Justice can be achieved only if the law has a conscience, a sense of what is right and what is wrong. Putting Mr. Friedel in prison any longer for this crime would be wrong. The defense respectfully urges the Court to reject that course.

## ARGUMENT

As the Court is aware, *United States v. Booker*, 543 U.S. 220 (2005), rendered the United States Sentencing Guidelines advisory in order to remedy the Sixth Amendment violation that resulted from a mandatory Guidelines system. The applicable advisory Guidelines range now is merely one factor that the Court must consider when imposing sentence, and the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). The Court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and to "impose

4

a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute.  *See* 18 U.S.C. § 3553(a).  As discussed below, the advisory Guidelines range in this case exceeds a level that is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing when one considers the unique circumstances of this case and the characteristics of Mr. Friedel.  Based on the history and characteristics of Mr. Friedel, the nature and unique circumstances of his offense, and the objectives of federal sentencing, Mr. Friedel asks the Court to reject the advisory Guidelines range in this case as excessive and to impose a sentence no greater than 180 months incarceration, followed by a term of supervised release.

Patrick Friedel is 29 years old and has pled guilty to one count of Production of Child Pornography and one count of Possession of Child Pornography.  This conviction represents Mr. Friedel's first contact with the criminal justice system.  He comes before the Court for sentencing with the support of family members and friends who have first-hand knowledge of the gentle manner, selfless nature and strong work ethic that Mr. Friedel has exhibited throughout his life.  (*See* Attachment B, a series of letters in support of Mr. Friedel.)  A highly regarded psychiatrist, Frederick S. Berlin, M.D., Ph.D., evaluated Mr. Friedel and has concluded that, while he needs professional help in order to be able to integrate his sexual needs into what has otherwise been a healthy, productive and fully responsible lifestyle, he manifests no evidence of pedophilia and he does not represent a future danger to the safety of others. *See* Attachment C.

Notwithstanding these and other mitigating factors, the mandatory minimum sentence required in this case will result in Mr. Friedel, at age 29, spending the remainder of youth and a substantial portion of the rest of his life in prison.  Mr. Friedel recognizes the gravity of the offenses to which he pled guilty and understands that he must be punished; and we respectfully

submit the purposes of federal sentencing can be more than fully served by imposition of the mandatory minimum.

## I.      The Advisory Sentencing Guidelines Range

The first step in post-*Booker* federal sentencing requires the Court to calculate the applicable advisory Guidelines range.  *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (citing *Gall*, 128 S. Ct. at 596-597).  Mr. Friedel does not dispute that his advisory Guidelines range is, as the Presentence Report (PSR) reflects, 262 to 327 months.  In order to arrive at the proper guideline range, the PSR writer had to first determine the offense level for the count of conviction.  For the Count of conviction, the PSR writer applied section 2G2.1 of the Guidelines Manual, which applies to offenses involving the production of child pornography.  Under that section, Mr. Friedel's base offense level is 32.  The PSR writer also determined that four separate Guidelines enhancements apply to Mr. Friedel's case:[5]  (1) a two-level enhancement because the offense involved a minor who had not attained the age of 16,[6] U.S.S.G. § 2G2.1(b)(1)(B); (2) a two-level enhancement because the offense involved a sexual act or sexual contact, U.S.S.G. § 2G2.1(b)(2)(A); (3) a two-level enhancement for the use of a computer, U.S.S.G. § 2G2(b)(6); and (4) a four-level enhancement because the offense involved material that portrays sadistic of masochistic conduct or other depictions of violence, U.S.S.G. § 2G2.1(b)(4).   Those enhancements result in an offense level of 42.

The PSR writer decreased the offense level by three, pursuant to U.S.S.G. § 3E1.1(a) and (b), based upon Mr. Friedel's demonstrated acceptance of responsibility.  Thus, Mr. Friedel's total offense level is 39.  Mr. Friedel's lack of any prior criminal record places him in Criminal

---

[5] The Guidelines computed by the PSR writer are identical to those anticipated by the parties and made a part of the written plea agreement entered into by the defendant and the Government.
[6] The minor in question was 15 at the time of the first contact, but turned 16 by the time they met again.

History Category I.   The resulting advisory Guidelines range is 262 to 327 months of imprisonment.

Identifying the applicable advisory Guidelines range is only the first step.  Although the Court "must include the Guidelines range in the array of factors warranting consideration" as it determines an appropriate sentence under § 3553, *Kimbrough*, 552 U.S. at 91, it is also the Court's important prerogative to decide independently how much persuasive authority the advisory Guidelines range should receive in a particular case.  In *Kimbrough*, the Supreme Court made clear that the broad discretion district courts possess in post-*Booker* federal sentencing includes the authority to question whether a Guideline truly reflects the sentencing considerations contained in § 3553(a).  *Kimbrough*, 552 U.S. at 102.  Independent scrutiny of the applicable Guidelines range is particularly appropriate when the Guideline at issue "do[es] not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role" of formulating Guidelines using an empirical approach based on data about past sentencing practices.  *Id.* at 93,102.  In *Kimbrough* itself, for instance, the Supreme Court found that the 100-to-1 weight ratio employed in the Guidelines for drug-trafficking offenses involving crack and powder cocaine "did not take account of empirical data and national experience."  *Id.* at 102 (internal quotation marks and citation omitted).  The Court upheld a district court's decision to sentence below the advisory range in that crack cocaine case based on its determination that the Guidelines "[drove] the offense level to a point higher than [was] necessary to do justice."  *Ibid.* (internal quotation marks and citation omitted).

As other district courts have recognized, the child pornography Guideline, like the drug-trafficking Guideline addressed in *Kimbrough*, has evolved through a political process that "is not representative of the Commission's typical role or of empirical study."  *United States v.*

*Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008).  The "[G]uideline has been steadily increased despite evidence and recommendations by the Commission to the contrary."  *Id.* at 1009; *see generally* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines,* Fed. Pub. Def. M.D. & W.D. of La., (rev. Jan. 1, 2009) at 3-23 (tracking changes made to the child pornography Guidelines since 1991 and concluding that "the changes to the child pornography guidelines [were] not the product of an empirically demonstrated need for consistently tougher sentencing," but instead were "largely the consequence of numerous morality earmarks, slipped into larger bills over the last fifteen years, often without notice, debate, or study of any kind") ("*Stabenow Article*").[7]  As a result, the child pornography Guideline fails to differentiate among the culpability of defendants and does not account for the personal and offense-related sentencing considerations codified in § 3553.  As Mr. Stabenow explains:

> The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum . . .   As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (*e.g.* use of a computer, material involving children under 12 years of age, number of images)." . . . The internet provides the typical means of obtaining child pornography, resulting in a two level enhancement.  Furthermore, as a result of internet swapping, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase.  The 2004 Guidelines created an Application Note defining any video-clip as creating 75 images.  Thus one email containing eight, three-second video clips would also trigger a five-level increase.  Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring an additional six-level increase.  Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive a five-level enhancement for distribution of a thing of value.  Thus, an individual who swapped a single picture, and who was only engaged in viewing and receiving child pornography for a few hours, can quickly obtain an offense level of 40.

---

[7] The *Stabenow Article* can be found at http://law.fd.org/index_files/child%20porn%20july%20revision.pdf.

*Stabenow Article* at 23-24.  *See also, United States v. Baird*, 580 F. Supp. 2d 889, 893-894 (D. Neb. 2008).

In the first two years after Troy Stabenow's article was first published one hardly saw a published opinion on child pornography where his article was not cited.  And his research spawned other studies which demonstrated the flaws of USSG § 2G2.2,[8] and offered suggestions for reform.  Mr. Stabenow followed with his own proposal for reforming the child pornography guidelines in 2011,[9] and more recently, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders.[10]  *See* U.S. Sent'g Comm'n, *Report to the Congress:  Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]  The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under U.S.S.G. § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions. *id* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability." *Id* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323.  Because "sentencing

---

[8] *See, e.g.* Carissa Byrne Hessick, *Disentangling Child Pornography from Child Sex Abuse,* 88 Wash. U.L.Rev. (2010) (concluding that the trend of increasing sentences for child pornography ought to be reviewed and suggesting several areas of reform.)

[9] Troy Stabenow, *A Method of Careful Study: A Proposal for Reforming the Child Pornography Guidelines,* 24 Fed. Sent'g Rptr. (2011).

[10] We recognize that one of the two counts to which Mr. Friedel entered his guilty pleas was a production charge. However, the guideline enhancements are almost identical to those for the possession charge of the second count; and it is those enhancements that form the basis of this particular argument.

enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id* at xi, "the current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id*. at 323.

The Commission reported that offenders have a variety of motivations for viewing child pornography, including "avoidance of stress or dissatisfaction with life." *Id*. at 79.  It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *Id*. at 278 &n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)).[11]

The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated to specific congressional directives or legislation directly amending the guidelines." *Id* at xviii, 322.  And, in particular, the Commission recommended that the specific characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of the images, the volume of the images, and other aspects of an offender's collecting behavior reflecting his culpability . . ." and "to reflect offenders' use of modern computer and Internet technologies." *Id*. at xviii-xix, 322-23.

Mr. Friedel is a case in point.  His guideline range is increased by slightly over 300%[12] due to the applicability of four separate Guidelines enhancements, each of which was triggered

---

[11] Dr. Berlin likewise addresses treatment in reference to Mr. Friedel's recidivism risks, stating, "Mr. Friedel appears to be highly motivated to break his long-time cycle of sexual promiscuity.  With appropriate professional help . . . it is my belief that his future prognosis is quite good."  And, even "if untreated (and he should be afforded treatment), in the future any risk that might be present would be to **himself**, and to his ability to maintain a committed monogamous relationship."  (Emphasis added) Exhibit C at 14-15.

[12] The base offense level under 2G2.1 is 32, or 29 after the three level reduction for acceptance of responsibility (87 to 108 months), which increases to a 42, or the ultimate offense level here of 39 after the three level decrease (262 to

by an offense characteristic that, as Mr. Stabenow explains, is present in most child pornography cases.

Mr. Friedel asks this Court, in sentencing him, to take into consideration that without the enhancements applied his sentencing range would be 87 to 108 months—substantially below the mandatory minimum the court must impose.[13]  As discussed below, Mr. Friedel submits that full consideration of the § 3553 factors in his case would have supported a sentence well below the advisory Guidelines range.

## II.    The Other § 3553 Factors

Section 3553 requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing.   18 U.S.C. § 3553(a).  Those four purposes are the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires district courts to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant;  (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence

---

327 months).  Thus the low end of each guideline range increases from 87 up to 262 months, one month more than a 300% increase.

[13]Mr. Friedel devotes so much ink to this guidelines argument because he has cooperated with the government in hopes of obtaining a 5K1.1 motion. To date his efforts have not reached fruition, even though he has been fully debriefed and even offered to take a pro-active role in other investigations.  However, he maintains hope that his cooperation may result in the filing of a motion to reduce pursuant to Rule 35, FRCP, at some later time.  If that were to happen, with the mandatory minimum no longer an obstacle, we would argue that the court should use as a starting point the guideline range that we believe should have been employed from the outset.

disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  For the reasons that follow, Mr. Friedel submits that were it not for the mandatory minimum of 180 months that the court is required to impose, a substantial downward variance from the advisory Guidelines range would be warranted in this case; and that, given the present posture of the case, the Court should not impose a sentence greater than 180 months.

A.      *The Nature and Circumstances of Mr. Friedel's Offense*

A meaningful discussion of the "nature and circumstances" of Mr. Friedel's offense must be twofold:  It must describe Mr. Friedel's criminal conduct, but it also must describe the events of many years ago that led to that criminal conduct as well as the circumstances surrounding the conduct itself.  That discussion follows.

1.  *Mr. Friedel's Criminal Conduct*

The conduct leading to Mr. Friedel's conviction is outlined fully in the presentence report [pp. 5-10], the Statement of Facts filed in support of the plea, in Dr. Berlin's report [Exhibit C] and even in Mr. Friedel's letter to the Court [Exhibit A].   In short, but to add at least some context, Mr. Friedel, from an early age, had a marked elevation in sexual pre-occupations, leading him to view adult appropriate pornography and masturbate frequently.  As he became older this preoccupation took hold and he sought out sex partners online.  Most were willing, consenting adults with whom he would meet for sexual activity in his car, his apartment, their car or anywhere else that was convenient and readily accessible.  Often he met and engaged in sex with multiple partners each day.  When he could not locate enough consenting partners each day, he would pay for sex.  Even when he had engaged in sex with one or more partners he would still

masturbate each day and stay up until the wee hours of the morning chatting online with other women in fantasy banter, often using the erotic chats to assist in achieving an erection.

Between 2012 and 2014, among the hundreds of adult women with whom Mr. Friedel engaged in sex and the thousands with whom he engaged in erotic sexual chats, five were under the age of 18.  He engaged in sexual contact with one and exchanged pornography with all five. He filmed a part of the sexual contact in which he engaged with the one minor—thus the Production of Child Pornography charge.  The specifics of the contacts are contained in graphic detail in the PSR and need not be repeated here.

Mr. Friedel understands that the offenses to which he pled guilty are serious and that there are, and should be, serious consequences.  Mr. Friedel also recognizes that child pornography has real victims and that courts and the criminal justice system have a strong interest in preventing future abuses against minors.  Mr. Friedel submits, however, that sentences imposed in child pornography cases generally, and in his case in particular, should account for the meaningful difference that exists between the thousands of offenders, many of which are predators and are, unlike Mr. Friedel, likely to reoffend.  Likewise his "Production" charge should be viewed in the context of the Production charges that are the basis of most if not all of those prosecuted in the federal courts.  As Dr. Berlin notes:

> I know of no evidence to suggest that Mr. Friedel has ever attempted to physically approach a disinterested female in an effort to impose unwanted sexual acts upon her.  To the best of my knowledge and belief, as an adult, he has never engaged in any sexualized acts or sexualized conversations with a pre-pubescent child—and in my professional opinion, he manifests no evidence of pedophilia.  Mr. Friedel indicated to me that in spite of numerous negative consequences, he had been unable to break away from his cycle of compulsive masturbation, and sexually promiscuous acts, [even though] he had sometimes deleted Apps from his phone that had enabled him to seek out sexual liaisons [and] at one point . . . put a monitor on his computer so that [his girlfriend] could track his interactions. He stated that his failure to break out of that pattern . . . had led him to feel ashamed and embarrassed, with a sense of depression and low self-esteem.

Berlin report at 2-3.  This sense of guilt and remorse when combined with the conclusions Dr. Berlin reaches based upon the testing conducted on Mr. Friedel, demonstrate the high likelihood that he will never reoffend.  He was quite simply in many ways just a pathetic young man whose sex drive had taken over and consumed his every waking moment.  He was so consumed in thoughts of sex that he had little idea with whom he was chatting and little care with whom he was meeting—old/young (and obviously on a very, very small number of occasions, too young), thin/heavy, black/white, professional/laborer—it did not matter.

Make no mistake, Mr. Friedel now understands that engaging in sexual acts with a person under the age of 18 and filming that activity is wrong and illegal.  He understands that consuming child pornography by downloading and viewing it supports child pornography as an illicit industry and contributes indirectly to the victimization of children that occurs in that industry.  And there is no dispute that Mr. Friedel must be held accountable for his actions.  But in answering the more refined question of how long Mr. Friedel should be deprived of his liberty, we urge the Court to consider the reasons that led to his conduct, his remorse and the fact that he is unlikely to reoffend.

Were it not for the required mandatory minimum sentence, imposition of a sentence well below the advisory Guidelines range in Mr. Friedel's case and well below the 180 month statutory minimum would fairly "reflect the seriousness of [his] offense" [and] "provide just punishment for the offense," as § 3553(a)(2) requires.

### 2.   The Events that led to Mr. Friedel's Criminal Conduct

Mr. Friedel was born and spent his formative years in Iowa.  He is the younger of two children born to his mother and father.  His first sexual related experiences occurred when he

was seven (7) years of age.  He found pornography that his father, an alcoholic and possible sex addict himself, had left unsecured in the family home.

Mr. Friedel's memories of his childhood are not pleasant.  His parents never touched and slept in separate bedrooms; and his father was often angry and verbally abusive of his mother and both verbally and physically abusive of him.

By age 11, when his parents had divorced, Patrick began looking at pornography independently of his father's collection.  He had become severely depressed and, by age nine (9), was prescribed medication—medication that his father refused to allow him to take.  He attempted suicide at age 11, while in fifth grade.  His mother worked two jobs, prepared the meals and cleaned the home.  His dad adopted the role of an aloof patriarch, was narcissistic, anti-social and mean.  This is how Patrick Friedel understood the dynamics between men and women; and this may offer some insight into his relationship with women as he grew older as well as help to understand the online activities that are outlined in the Statement of Facts in support of the plea.

As one reads through the Statement of Facts it is difficult to comprehend that people speak in such a fashion.  The words that Mr. Friedel and the underage girls typed as they communicated with one another are beyond description for this writer.  And there can be no justification for such activity.  But, in determining what punishment must be handed to someone who has engaged in the chats and sharing of pictures that are described in the documents presented to the Court, some things must be considered.  First, as disgusting as most of us who have read these chats and seen these pictures find them to be, the thousands upon thousands of chats in which Mr. Friedel engaged were, except for the five individuals listed in the

15

Information, with consenting adult females.  Disgusting?  Yes.  Immoral?  Probably.  Illegal?  Not as long as the activity was with a consenting adult, as were 99.99%.

Second, we believe the Court should consider that the chats and sharing of pictures was not a one-way street.  And, as the Court reads—if it has the stomach to so read—the description of the activities in which Mr. Friedel and the minors engaged,[14] we only ask that the Court remember that 1) Mr. Friedel did not seek out minors for these chats:  The chats with the five minors were intertwined with chats of thousands of adults and each of the minors had themselves voluntarily enrolled on social media sites where they were expected, and on one site required, to claim to be 18 years of age;[15] and 2) the genesis of most, if not all, of the things that Mr. Friedel asked the minors to do or send to him was from reading other chats in which the minors had engaged in identical conduct with other adult men.  For example, the accurate allegation that Mr. Friedel directed one of the minors to write "Patrick's sex slave . . . on her legs and groin," is something Mr. Friedel saw that this minor had done before with a different person.  While we could go through the Statement of Facts line by line and offer this type excuse/reason for each thing Mr. Friedel asked, said and did, we decline to do so.  The mere fact that the minors had engaged in this type behavior in the past is no excuse for Mr. Friedel.  We offer these facts only as further proof that Mr. Friedel was not seeking out minors, was not asking minors to do things that they, as minors, had not done before and that his perverted language was not directed to them because they were minors over whom he felt any sense of control.   They were,

---

[14] Our discussion is only of the minors because that is the only illegal activity at issue.  But the chats and activities in which Mr. Friedel and the adults engaged were just as abhorrent.

[15] Mr. Friedel does not use this as an excuse.  Once he learned, as he did, the true age (or at least true claimed age) of each of the minors he should have immediately stopped the conversation.  Period!  He did not and he understands the consequences he must now face.

unfortunately, just a miniscule percentage of the total number of females with whom he was carrying on this activity each and every day of his life.

Among the long list of factors that set Mr. Friedel apart from the average person charged with the type crimes to which he has admitted guilt are that Mr. Friedel, by all accounts, is not a pedophile, he sought treatment and was in recovery for his sexual disorders before being charged with the federal crimes (discussed more fully *infra*), self surrendered to authorities when he learned he had been charged and has attempted to cooperate with authorities in this case and others since being held on these charges. Mr. Friedel has no criminal record. He has never sought out minors and all who know him never believe he would. He welcomes therapy during his period of incarceration to address the addiction[16] that led to the criminal conduct in this case. He has expressed sincere, heartfelt remorse. He has led an otherwise upstanding life. And he has the unconditional support of his extended family and his friends.

As discussed next, when Mr. Friedel is considered "as an individual" as *Gall* mandates, it is clear that the mandatory minimum sentence the court must impose is much greater than necessary to serve the purposes of sentencing.

    B.    <u>*The History and Characteristics of Mr. Friedel*</u>

The history and characteristics of Mr. Friedel support the Court imposing the minimum sentence available. Mr. Friedel, who before his arrest lived in Northern Virginia and worked as an international specialist at the U.S. Department of the Interior, was born in Davenport, Iowa on June 5, 1985. He is the youngest of two children born to Michael and Janice Friedel. His formative years were anything but stable. As has been reported in the PSR as well as by

---

[16] The addiction is a sex addiction, not an addiction to child pornography. Even though one count of the Information is for Possession of Child Pornography, much of the "child pornography" was of the pictures the minors sent of themselves. The other images were images that, unbelievably, the minors were themselves sharing. This writer has to believe that this was more of a game they were playing than anything else.

17

Mr. Friedel and his mom in their letters to the Court, while his mom did her best to provide a stable middle class family environment defined by high Christian morals, principles and values where he was encouraged to do well in school and be respectful of others, the family was torn apart by a physically and mentally abusive father.  As a child Patrick Friedel had to not only endure the abuse but also the hurt of watching his older brother being treated far better and hearing his father constantly tell him that his mom would eventually abandon him.  Patrick Friedel even had to manage his depression over his home life without the assistance of the medications prescribed by mental health professionals because his father did not believe in medication and took them from him.

Through all the torment he endured, Patrick Friedel's true inner being was never extinguished.  He was always given proper guidance by his mother and the values she taught him have been front and center in his life, a selfless life where he has always given more than he has taken.

Mr. Friedel's educational and work histories are presented in the PSR and by various family members and friends in their attached letters.  In short, Mr. Friedel graduated from Dowling Catholic High School in West Des Moines, Iowa in 2003 and later obtained a Bachelor of Arts Degree in 2008 from the University of Iowa.  And in May of 2012 he obtained his Master of Arts in Arab Studies from Georgetown University.  Shortly after obtaining his Master's degree Mr. Friedel began work for the U.S. Department of Labor, Bureau of International Relations, before resigning to work for the Department of Interior (DOI), where he worked until his arrest in this case.  As the court can see from the attached letters, all who know Patrick Friedel attest to his strong work ethic.  His direct supervisor at DOI, Julie S. Fleming, who has written in support of Mr. Friedel, highlights his "[a]ttention to detail and appreciation of cultural

sensitivities" as well as "his good analytical and communications skills" in describing his tenure at her department. She advises the she "received many compliments on the quality of his work, professional demeanor and engagement style."

Mr. Friedel's work history began well before he graduated college and obtained his Master's, as is detailed by the PSR. And those who knew him years ago have also written. Amie Ohlmann, supervised Patrick as a speech coach when he was in college. She remembers that "[o]ut of all coaches I have worked with, Patrick was my most valued assistant and I look fondly on that time we were able to coach together." And, Ms. Ohlmann, like almost all who have ever met Patrick Friedel, they became friends. She describes the friend he became as "a young man with a wonderful sense of humor, clear confidence, incredible charisma, exceptional poise and undeniable talent" who was adored by students, respectful, genuine and kind, highly intelligent and incredibly hardworking. His boss at the Department of Labor, Robert Shepard, concurs, stating that Patrick's "work was excellent and he consistently displayed a keen and thoughtful approach to problems in the Middle East." Mr. Shepard continues, observing that "Patrick was not only a fine worker but a wonderful colleague who got along extremely well with his coworkers, his supervisors, our leadership team, and his counterparts in other agencies." And, aside from his work, Mr. Shepard found him "unfailingly polite and considerate, welcoming and courteous," with an "intrinsic decency and sensitivity."

Even more telling is the work that Mr. Friedel has done while incarcerated awaiting his fate in this case. His letter to the Court lists the various tasks he has undertaken at the Alexandria Detention Center, including working in his unit, tutoring for the GED program, assisting GED students with their studies and helping them for a life after prison. The Inmate Education Coordinator at the Detention Center, Krista Sofonia, has written to confirm the

assistance given by Mr. Friedel in the GED classes. (*See* Exhibit D)  This, of course, does not surprise his family or friends, many of whom have written in support of Patrick and whose letters share a common theme:  Patrick Friedel is a hard worker with a social conscience, who gives to the community.  So many of the same words and phrases are used time and again to describe Patrick--kind, nurturing, eager to help, respectful, generous, brilliant, committed.  Those who have written include not only his immediate family but also former employers, teachers, professors, coworkers and friends of the family.

In addition to being a hard worker, Mr. Friedel has been a good citizen.  He has never been accused, much less convicted, of a criminal offense before his arrest in this case.  People who know Mr. Friedel support him in this time of adversity and offer first-hand accounts of the care, compassion, and honesty that he has exhibited in his personal relationships throughout his life.  The letters demonstrate that during his childhood and through his adult life, Mr. Friedel has impressed and positively affected others with his kind, generous, and humble nature.

Several of Mr. Friedel's close relatives have written and, as most would expect, speak highly of him.  They are shocked at the charges but nonetheless assert how out of character these charges are for him.  They speak of his honesty and loyalty and how he would never do anything to hurt or humiliate anybody.

The acclamations go on and on and we do not intend to quote extensively from each and every letter, but add one additional theme that runs throughout the letters:  Each and every one of those with children have no fear of Patrick being around their children, even knowing the charges to which he has pled guilty.  And all who have been around Patrick and watched his interaction with women attest to the fact that he has always been respectful to women and never done anything demeaning or harmful to any woman.

These letters demonstrate that the crimes to which Mr. Friedel has pled guilty does not reflect his fundamental character, which is that of a kind, sensitive, and loyal son, brother and friend who has consistently provided vital moral support to loved ones during crises and sincere friendship to those with whom he has worked and socialized.  The people who know Mr. Friedel view his convictions as an aberration from a lifetime of kindness, and those perspectives alone support a substantial downward variance in this case.  *See United States v. Grober*, 595 F. Supp. 2d 382, 408 (D.N.J. 2008) ("[The defendant's] family members and friends and neighbors described him without artifice and with great sincerity as a good and caring man.  The existence of 'the history and characteristics of the defendant' is a cornerstone of the sentencing factors.  It means that a life well-lived counts.").

Another important component of Mr. Friedel's history and characteristics is his psychological functioning and the likelihood that he will not engage in criminal conduct once he returns to the community.  To assist the Court in assessing those factors, Mr. Friedel agreed to be evaluated by Dr. Frederick S. Berlin, a psychiatrist and professor at The Johns Hopkins University School of Medicine; and Mr. Friedel has consented to disclosure of Dr. Berlin's report to the Court.[17]  The purpose of Dr. Berlin's evaluation was to assess whether Mr. Friedel possesses personality characteristics similar to those of violent sexual predators and offenders, to determine if he is a pedophile, whether he has ever attempted to physically approach any disinterested female in an effort to impose unwanted sexual acts on her and whether he represents a future danger to the safety of others.  Dr. Berlin not only interviewed and tested Mr. Friedel, but Dr. Berlin also reviewed the charging documents and the entire file of counsel,

---

[17] Dr. Berlin's report and *curriculum vitae* are included as exhibits to this Memorandum at Attachment C.  The *vitae* details the extensive qualifications of Dr. Berlin in the area of sexual disorders.

including a vast array of medical records and all the discovery materials provided counsel in an effort to assist in his evaluation and in answering the questions posed to him by counsel.

Dr. Berlin's diagnostic and forensic psychological conclusions lead him to assert that: "I know of no evidence to suggest that Mr. Friedel has ever attempted to physically approach a disinterested female in an effort to impose unwanted sexual acts upon her. I also know of no evidence that he has ever intentionally injured another individual, either via sexual acts or otherwise." Berlin report at 2. Dr. Berlin adds, "and in my professional opinion, he manifests no evidence of pedophilia (a sexualized attraction to prepubescent youngsters)." Berlin report at 3. And Dr. Berlin concludes by stating "[o]nce again, in my professional opinion, although he has clearly acted wrongly and criminally, he does not represent a future danger to the safety of others." Berlin report at 15.

A part of Dr. Berlin's analysis of Mr. Friedel centered on Mr. Friedel's attempts to deter his indiscriminate pattern of sexual promiscuity (Report at 3), Mr. Friedel's expressed remorse for his actions (*Id.* at 4), how awful he feels about his actions (*Id.* at 7) and how disgusted he feels with himself after engaging in any sexual activity. *Id.* at 11. And Dr. Berlin took into account the proactive efforts taken by Mr. Friedel prior to his arrest, including sex addiction classes, taking Zoloft not only as an antidepressant but also as a drug known for its sex drive lowering effects, seeing a therapist,[18] and voluntarily enrolling in a 60-day inpatient residential

---

[18] Mr. Friedel, through his employment, saw Nancy Pentz on six occasions. She advises that Mr. Friedel was candid with her, withholding nothing; and that Mr. Friedel has expressed in a most heartfelt way his remorse about his behaviors. Her letter to the Court is attached as Exhibit E.

treatment program (Pine Grove) in Mississippi that specializes in the treatment of sexual addiction.[19]

Mr. Friedel has the desire, the personality strengths and the family support necessary to ensure that he reintegrates into society as a law-abiding citizen. To be sure, he has issues that must be addressed, but there are few with the ability and desire to address them as forcefully as Patrick Friedel.

     C.     *The Purposes of Federal Sentencing*

As noted at the outset, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence within the statutory penalty range. The sentence must be "sufficient, but not greater than necessary" to serve those purposes. With these guideposts in mind, Mr. Friedel respectfully asks the Court to sentence him to the absolute minimum allowable—180 months incarceration, which falls below what we believe to be a guideline range that is excessively high.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law,[20] and to provide just punishment for the offense." As discussed in section II (A) above, Mr. Friedel understands that he has been convicted of a serious offense and that he must endure the consequences of his actions. We submit that "just punishment" for his criminal conduct can be achieved through 180 months of incarceration, given that Mr. Friedel will be on supervised release for at least five (5) years and possibly up to life as well as being required to register as a sex offender with the attendant requirements of such registration.

---

[19] A letter and the accompanying discharge papers from Pine Grove are attached as Exhibit F. As the PSR accurately reports [PSR at page 15, paragraph 93 and fn 4], Mr. Friedel was discharged with a prognosis of "Fair," which is the highest discharge prognosis awarded by Pine Grove.

[20] Some courts have recognized that a sentence so out of proportion to the conduct does not promote respect for the law, but actually promotes disrespect for the law. *See United States v. Williams*, 435 F3d 1350, 1352-53 (11th Cir. 2006).

Moreover, the Court can consider the fact that 15 years of incarceration will result in considerable punitive consequences for Mr. Friedel.  Incarceration will separate him from the relationships that he values so highly and place him in a community of individuals who, in some cases, may be intolerant of Mr. Friedel's intellect and gentle manner.

The consequences of 15 years of incarceration for Mr. Friedel also will include the loss of his job, loss of an ability to continue his chosen profession and his reputation.

A period of 15 years of incarceration in a case such as this is not a "slap on the wrist." Mr. Friedel, as a registered sex offender, will have great difficulty finding future employment and almost every aspect of his life will be under constant scrutiny.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."  That goal also would be fully served by a sentence of 15 years behind bars.

Because there is no risk of recidivism and consequently no need for incapacitation under § 3553(a)(2)(C), there is also no need for specific deterrence under § 3553(a)(2)(B).  Both these factors weigh heavily in counterbalancing the government's almost universal argument based on general deterrence.  "[T]he government's argument based on deterrence alone is flawed because it elevates one 3553(a) factor---deterrence---above all others." *United States v. Gardellini,* 545 F.3d 1089, 1093 (D.C. Cir. 2008).  Balancing *all* of the § 3553(a)(2) factors, the Court should conclude that a sentence of 180 months is sufficient but not greater than necessary to serve § 3553(a)(2)'s purposes as a whole.

A sentence of 15 years of confinement is more than necessary to provide adequate general deterrence.  Mr. Friedel's loss of career and livelihood, the brand of a felony conviction, and the consequent hardships with future employment, not to mention the draconian consequences of sex offender registration, are all significant deterrents to others who might be

tempted to commit this type criminal activity.  "One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent." Symposium, U.S.S.C., *Federal Sentencing Policy for Economic Crimes and New Technology Offenses,* Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000).  Moreover, there is a moral limit on the extent to which the need for general deterrence can or should be borne on the shoulders of one individual. *See United States v. Meyers*, 353 F. Supp. 2d 1026, 1029 n. 1 (S.D. Iowa 2005); Robinson, *Distributive Principles of Criminal Law*, at 223 (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  There is nothing in the record before the Court that suggests that Mr. Friedel would present a danger of recidivism if he were sentenced, as we suggest, to a term of 180 months incarceration.  Before his arrest in this case, Mr. Friedel had no contacts at all with the criminal justice system.  The absence of a criminal history is a valid reason for finding that the purposes of sentencing will be adequately served by a sentence below the advisory Guidelines range. *See, e.g., United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I").  Moreover, a psychiatrist with extensive training in evaluation and treatment of sex offenders has examined Mr. Friedel and concluded that he is not a future threat to the community. *Cf. United States v. Johnson*, 588 F. Supp. 2d 997, 1005-1006 (S.D. Iowa 2008) (rejecting government's reliance on the "Butner Study" of incarcerated

individuals participating in a sexual offender treatment program to impute to a defendant convicted of receiving child pornography the likelihood that he committed sexual abuse in the past; district court "will not accept the implicit invitation to use the Butner Study to hold Defendant accountable for a phantom crime unsupported by any evidence").

Further, The United States Sentencing Commission's research demonstrates that employment, education, lack of criminal history, and family ties and responsibilities all predict reduced recidivism, *see* United States Sentencing Commission ("USSC") *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12-13 & Ex. 10 (2004); USSC, *Recidivism and the "First Offender,"* at 7-8, Ex. 2, 3, 6, 13-16 (2004).

"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime." Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 Kan. J.L. & Pub. Pol. 317, 344-45 (Spring 2013), at pp 344-345. Studies show that sex offenders are 25% less likely to reoffend than non-sex offenders and that sex offender treatment cuts recidivism by more than half. *See* NACDL Report: *Truth in Sentencing? The Gonzales Cases*, 17 Fed. Sent. Rep. 327, 328 (June 2005); *see also* Ctr. Sex Offender Mgmt., Office of Justice, Dep't of Justice ("DOJ"), *Myths and Facts About Sex Offenders* (August 2000), at 3 ("recidivism rates for sex offenders are lower than for the general criminal population"); DOJ, Bureau of Justice Statistics, *Recidivsm of Sex Offenders Released From Prison in 1994* (2003), at 2 ("Compared to non-sex offenders released from State prison, sex offenders had a lower overall re-arrest rate").

Additionally, a sentence of 15 years would result in Mr. Friedel's release in his mid-forties. "For years, research has consistently confirmed one fact: recidivism rates decline with age." *Barred Forever*, at 346. The "aging effect" exists regardless of any other factors. *Id.*

Mr. Friedel's self-examination of his conduct, his desire to address his problems through a treatment regime while incarcerated, the conclusion of Dr. Berlin, and his character, as demonstrated by the many letters of support, give great weight to a finding that he poses little threat to the community now and will pose no threat to the community after serving 180 months of incarceration.

[redacted]







[redacted]

---

[redacted]

## IV. The Requested Sentence Avoids Unwarranted Disparities

Sentencing courts must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentences. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* at 113 (2004).

As the following cases demonstrate, even if a case involves allegations of sexual contact and/or the production of child pornography, as this one does, the sentences do not often exceed

15 years (followed by lifetime supervised release).[23] *See, e.g., United States v. Hanlon*, Cr. No. 13-cr-283-GK (D.D.C. 2013) (defendant enticed numerous underage females to create pornography and send to him, traveled to meet someone he believed to be under age for purposes of engaging in illicit sexual conduct, pleaded guilty to receipt of child pornography and sentenced to 96 months); *United States v. Byron Sanchez*, Cr. No. 11-093-RBW (D.D.C. 2011) (defendant who produced or caused to be produced, child pornography of his daughter, sentenced to 72 months for receipt of child pornography); *United States v. Brandon Rock*, Cr. No. 11-376-RMC (D.D.C. 2011) (defendant who produced pornographic pictures he secretly took of his stepdaughter via a hidden camera and distributed them, sentenced to 172 months).

The defense respectfully submits that a sentence of more than 15 years would cause disparity with other sentences. A sentence substantially longer than 180 months would exceed the sentences from cases involving worse conduct than that seen here. *See e.g. United States v. King,* 741 F.3d 305 (1st Cir. 2014) (defendant videotaped with hidden camera his stepdaughter masturbating in her private bathroom, pattern of abuse and no acceptance of responsibility, sentenced to 72 months); *United States v. Holloway,* 2013 U.S. App. Lexis 20896 (11th Cir. 2013) (sent. aff'd) (defendant created then emailed sexually explicit child pornography photographs of victims who were 14 years old and "horrified" and were in "clear pain" even though they were furnished alcohol, sentenced to 135 months); *United States v. Johnson,* 715 F.3d 1094 (8th Cir. 2013) (aff'd denial of motion to withdraw guilty plea) (defendant videotaped himself having sex with his 17 year old girlfriend, sentenced to 36 months); *United States v.*

---

[23] Counsel has not found any case whose facts compare closely to those present in this case—namely, "production" by filming oneself with a consenting 15 year old (obviously to the extent that a 15 year old can legally consent). We cite to a number of cases from the trial level in the U.S. District Court for the District of Columbia, where the Federal Public Defender keeps a database, and from a number of cases from various Courts of Appeal where there are at least some similarity to the facts of Mr. Friedel's case or facts far more egregious wherein the sentences were lower than the Guidelines would require here.

*Epps,* 2012 U.S. Dist. Lexis 6120 (E.D. Cal. Jan. 15, 2013) (denying § 2255 motion) (defendant with a Criminal History IV charged with production of child pornography as well as sex trafficking, sentenced to 151 months); *United States v. Secrest,* 2012 U.S. Dist. Lexis 183920 (E.D. N.C. 2012) (denying  § 2255 motion) (naked child victim suffered severe physical abuse from mother in front of webcam, where defendant was at a level 43, sentenced to 108 months); *United States v. Marlana Quigley*, Cr. No. 09-182-RMU (D.D.C. 2009) (defendant who produced picture of her own naked 6-year-old son and distributed it as well as other appalling child pornography sentenced to 15-year mandatory minimum for production of child pornography); *United States v. Tanner Stickney*, Cr. No. 09-cr-152-HHK (D.D.C. 2011) (defendant who filmed himself raping a 4-year old child, distributed film, and attempted to set up a second encounter sentenced to 15 years (case also involved cooperation)); *United States v. Baker,* Crim. Action No. 07-0435 (JRS) (E.D. Va. 2007) (defendant offered to trade undercover officer child pornography images that he had produced of his 11 year old daughter in return for other child pornography, and convinced his wife to make false confession to charges in order to avoid responsibility, sentenced to 108 months) (facts of case described in *Baker v. Hollingsworth*, 2014 U.S. Dist. LEXIS 123930 (D.N.J. 2014) (related civil action).   In the context of the sentences for these cases, a sentence of 180 months is sufficient but not greater than necessary to meet the sentencing needs identified by statute.

In fact, an argument can be made that the mandatory minimum of 15 years that seemingly is the minimum the Court can impose, short of a motion by the government, would demonstrate great disparity from similarly situated defendants.   If the Court believes, as we do, that the mandatory minimum would result in an unconstitutionally excessive sentence prohibited by the Eighth Amendment or that the mandatory minimum sentence required by 18 U.S.C. § 2251(a) is

inconsistent with 18 U.S.C. § 3553, as interpreted by *Booker*, then we submit that the Court has the duty to so find and to impose a sentence that it believes is sufficient but not more than necessary to meet the goals of sentencing, regardless of any mandatory minimum.

The Eighth Amendment provides:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  As the United States Supreme Court has stated, "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48. 59 (2010).  The core of the Amendment's guarantee is "the precept of justice that punishment for crime should be graduated and proportional to [the] offense. *Id.* (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910).

In the circumstances of this case, imposition of the 15 year mandatory minimum sentence of § 2251(a) would result in punishment that is grossly disproportionate to the severity of the underlying crimes and, therefore, would constitute "cruel and unusual punishment" that violates the Eighth Amendment.  Automatic imposition of a 15 year mandatory minimum sentence in this case, without consideration of the mitigating factors reflected in the preceding pages, will trample this safeguard and violate the Eighth Amendment's prohibition against excessive punishments.  Courts must impose criminal penalties that "accord with the dignity of man" in that they must "not involve unnecessary and wanton infliction of pain" or "be grossly out of proportion to the severity of the crime." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  Put differently, the Eighth Amendment mandates that punishment "be exercised within the limits of civilized standards. *Trop v. Dulles*, 356 U.S. 86, 99-100 (1958) (plurality opinion).  We respectfully submit that a 15 year sentence in this case crosses the threshold prohibited by the Eighth Amendment and that the Court should so rule.

Alternatively, we submit that, should this Court believe that the mandatory minimum 15 year sentence required by 18 U.S.C. § 2251(a) is more than necessary to meet the purposes of sentencing, as is mandated by 18 U.S.C. § 3553(a), the only meaningful way in which to resolve the statutory inconsistency is to impose the sentence the Court feels is sufficient but not more than necessary.  Such a sentence would also avoid an Eighth Amendment violation.

## CONCLUSION

**WHEREFORE** based on the foregoing reasons and any others that may appear to the Court, Mr. Friedel respectfully prays that this Court sentence him to no more than the 180 months required by the statutory mandatory minimum; and if the Court believes, as we do, that such a sentence is more than necessary to meet the purposes of federal sentencing, that the Court sentence him below such mandatory minimum.  The defendant also requests that the Court recommend treatment under the RDAP program to deal with the abuse of Hydrocodone, as noted by the PSR writer (*See* PSR at paragraph 94), and that the Court recommend designation to Petersburg, VA.

Date:  April 16, 2015                              Respectfully submitted,


                                                  /s/ G. Allen Dale_____
                                                  G. Allen Dale
                                                  Attorney for Patrick Friedel
                                                  Admitted *Pro Hac Vice*
                                                  Law Offices of G. Allen Dale, PLLC
                                                  575 7th Street, NW
                                                  Suite 300 South
                                                  Washington, D.C. 20004-2601
                                                  Telephone: (202) 638-2900
                                                  Facsimile: (202) 783-1629
                                                  gallendale@aol.com

/s/ Stuart A. Sears
Stuart A. Sears
Virginia Bar Number: 71436
Attorney for Patrick Friedel
Schertler & Onorato, LLP
575 7th Street, N.W.
Suite 300 South
Washington, D.C. 20004-2601
Telephone: (202) 628-4199
Facsimile: (202) 628-4177

## CERTIFICATE OF SERVICE

I hereby certify that a true copy (un-redacted) has been delivered to the office of the

United States Attorney, directed to the attention of Assistant United States Attorney Tracy

McCormick and to probation officer Jennifer D. Lyerly this 16th day of April 2015, and that

through ECF filing copies of the redacted version will be delivered to AUSA Tracy McCormick

and Jennifer D. Lyerly.

/s/ Stuart A. Sears
Stuart A. Sears
Virginia Bar Number: 71436
Attorney for Patrick Friedel
Schertler & Onorato, LLP
575 7th Street, N.W.
Suite 300 South
Washington, D.C. 20004-2601
Telephone: (202) 628-4199
Facsimile: (202) 628-4177